JASON M. FRIERSON
United States Attorney
District of Nevada
Nevada Bar No. 7709
STEVEN W. MYHRE
Nevada Bar No. 9635
NADIA J. AHMED
Nevada Bar No. 15489
Assistant United States Attorneys
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Steven.Myhre@usdoj.gov
Attorneys for the United States

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>vs.<br><br>ORLANDIS WELLS, M.D.,<br><br>             Defendant. | 2:19-cr-00216-ART-NJK<br><br>**Government's Response in Opposition to Defendant's Motion to Exclude Testimony of Government Expert Witness Dr. Jeffery Muir (ECF No. 110)** |

**CERTIFICATION:** This Response is timely filed.

The Motion should be denied. Dr. Muir's testimony is based on his specialized knowledge, expertise, and skill and, as such, is admissible under *Kumho Tire*. Defendant's claim that Dr. Muir's opinions cannot be used in a criminal trial because they arise from an inquiry by Nevada's medical licensing authority is without foundation in law or fact. The Court's gatekeeping function under *Daubert* does not include assessing whether the opinion arises from an administrative proceeding but whether it is reliable. Defendant makes no

1

showing to demonstrate that Dr. Muir's opinions are unreliable. Accordingly, the testimony is admissible under Rule 702. A Memorandum of Points and Authorities follows.

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.   Procedural Posture.**

On August 21, 2019, the defendant was charged by Indictment with 32 counts in violation of Title 18, United States Code, Section 841(a)(1), for unlawfully distributing by prescription, quantities of oxycodone and hydrocodone.[1] Specifically, the Indictment charged the defendant, a licensed physician, with knowingly and intentionally distributing oxycodone and hydrocodone on various dates without a legitimate medical purpose and outside the usual course of professional practice. Trial of this matter is scheduled to commence on March 28, 2023.

On December 27, 2022, and in anticipation of trial, the government filed its Notice of Intent to Call Expert at Trial under Fed. R. Crim. P. 16 and Fed. R. Evid. 702 (hereinafter "Expert Notice"),[2] disclosing the government's intent to call Jeffery Muir, MD, as an expert witness in its case-in-chief. On February 21, 2023, defendant filed a Motion to Exclude Testimony of Government Expert Witness Dr. Jeffery Muir (hereinafter "Motion"), contending that the Court should invoke its "gatekeeping" authority to preclude the testimony as "completely misguided, and lacking in any of the factors required by *Daubert*."

This Response follows. For the reasons explained herein, the Motion should be denied. Defendant cites none of the *Daubert* factors to preclude Dr. Muir's testimony. His

---

[1]   ECF No. 1.

[2]   ECF No. 88.

testimony is based on his specialized skill, knowledge and expertise and, as such, more than fulfills the threshold reliability inquiry under *Kumho Tire*.

**B.     Facts.**

The government intends to call Dr. Jeffry Muir as an expert to offer his findings and opinions about lack of medical necessity and deviations from the course and scope of the professional practice of pain medicine for the prescriptions charged in the Indictment as violations of Section 841. As the government's Expert Notice explained, Dr. Muir's opinions as to those prescriptions, and the treatment of the patients in relation to those prescriptions, are set out in two "Statements of Medical Opinion" that he authored for the Nevada State Board of Medical Examiners (hereinafter "NSBME" or "Board").[3] The Notice explained that Muir's "Statements of Medical Opinion" served as "Reports of Examinations or Tests" under Rule 16[4] and that in authoring his Reports, Dr. Muir reviewed and relied upon patient files that corresponded to Patients B-H (listed in Counts 5 – 18) and I-O (listed in Counts 19-32).

Dr. Muir's Reports were separately disclosed in discovery and were referenced by Bates number in the Notice. While the reports provide Dr. Muir's detailed analysis of the patient records associated with the charged prescriptions and his explanations for where and how the prescriptions lack medical necessity and deviated from the medical standard of care for prescribing opioids, that analysis will not be recounted in full here as the Motion does not appear to contend that they are not relevant. Rather, the Motion challenges the Reports under

---

[3]   ECF No. 88 at 2.

[4]   Federal Rule of Criminal Procedure 16.

3

*Daubert*,[5] contending that they cannot be used in a criminal trial because they arise from an administrative inquiry into the conduct of the defendant's medical practice.

The origin of the Reports links to the time that Dr. Muir served as an Investigative Committee Peer Reviewer for the NSBME, an agency of the State of Nevada that regulates and administers medical licenses for Nevada physicians. Following procedures outlined by Nevada law, the NSMBE has the authority to revoke or suspend a physician's license to practice medicine in the state.

In accord with its authority and in October 2016, the NSMBE notified the defendant that the Board had received information that he was practicing medicine in violation of the Nevada Medical Practice Act by excessively prescribing controlled substances without medical necessity and by failing to follow the Federation of State Medical Boards (FSMB) Model Policy [on the Use of Opioid Analgesics in the Treatment of Chronic Pain] (hereinafter "FSMB Model Policy").  The notification also informed the defendant that his practice of prescribing the controlled substances may have exceeded his training in obstetrics and gynecology. The NSMBE notification delineated the names of the patients that were the object of the allegations and requested that the defendant provide the Board with the patient medical files and treatment plan for each of those patients.

In May 2017, the NSMBE similarly notified defendant again that his practice of medicine was allegedly falling below the standard of care. This time, the May notification informed that the Board had information that the defendant was prescribing large doses of opiates along with benzodiazepines and muscle relaxants – specifically oxycodone, methadone, and soma – without medical necessity. Among other things, the notification

---

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

4

informed that the defendant's prescribing practices may have failed to follow the FSMB Model Policy and that his care and treatment of patients may have fallen below the standard of care. As with the previous notification, the 2017 notification delineated the names of the patients that were the object of the allegations and requested the defendant to provide the Board with the patient medical files and treatment plan for each of those patients.

As a Peer Reviewer, Dr. Muir reviewed the information provided to the Board by the defendant in response to the inquiry, including the patient medical records and treatment plan. He was tasked by the Board to generate a report containing his analysis, opinion and evaluation of the treatment of the identified patients, including his analysis and evaluation of the medical necessity of the prescribed medications and whether the prescriptions deviated from the standard of care. Following his review, Dr. Muir submitted his Report to the Board as to each of its inquiries. Those Reports contain the analysis, evaluation, and opinions that the government intends to offer at the defendant's trial.

Defendant's Motion seeks to preclude Dr. Muir's Reports and expert analysis and opinions under *Daubert*, contending as follows:

- Being grounded in proceedings before the NSMBE, Dr. Muir's Reports cannot be used in a criminal proceeding.[6]
- Dr. Muir's Reports are not based on a suitable theory or technique because they rely upon the FSMB Model Policy as the standard of care.[7]

---

[6] Motion at 4-5.

[7] Motion at 5-7.

5

- Dr. Muir has no factual or scientific basis under Rule 702(b) to opine that the defendant did not perform a physical examination on patients to whom he prescribed opioids. [8]

As shown below, none of these contentions precludes Dr. Muir's expert testimony either under *Daubert* or the plain language of Rule 702. The Motion should be denied.

**C.  Legal Standard.**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[9]

In *Daubert*,[10] the Supreme Court instructed that with respect to Rule 702 opinions, the trial court acts as a "gatekeeper" to "ensure that any and all *scientific* testimony . . . is not only relevant, but reliable."[11] While *Daubert* identified the presence of certain factors – such as whether the expert applied a tested, peer-reviewed and published scientific theory in arriving at the opinion – as indicating reliability, "the test of reliability is 'flexible,' and *Daubert* 's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather,

---

[8]  Motion at 7-9.

[10]  *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590-93 (1993).

[11]  509 U.S. at 589 (emphasis added).

the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[12] The court, therefore, has discretion "to choose among reasonable means of excluding expertise that is *fausse* and science that is junky."[13]

Accordingly, "far from requiring trial judges to mechanically apply the *Daubert* factors—or something like them—to both scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that judges are entitled to broad discretion when discharging their gatekeeping function."[14] Where reliability depends heavily upon the knowledge and experience of the expert, rather than the methodology or theory behind it, the *Daubert* factors are simply not applicable.[15] Thus, opinion testimony may properly be deemed reliable for the jury to consider where the opinion is based upon the expert's "knowledge and experience of [the relevant] discipline."[16]

A pretrial hearing is not required to perform the gatekeeping inquiry under *Daubert*.[17] All that is required is that the court "make a determination as to the proposed expert's

---

[12] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

[13] *Id.* at 159 (Justice Scalia concurring and stating that the *Daubert* factors are not "holy writ").

[14] *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (no abuse of discretion in allowing opinion evidence regarding gang affiliation).

[15] *United States v. Mendoza-Paz*, 286 F.3d 1104, 1112 (9th Cir. 2002) (no abuse of discretion in allowing testimony on street value of marijuana where valuation based on expert experience investigating narcotics trafficking for eleven years).

[16] *Kumho Tire*, 526 U.S. at 149 (internal quotations and citations omitted).

[17] *United States v. Altorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (no abuse of discretion where district court did not hold separate hearing on expert testimony on street value of marijuana, holding: "Nowhere in *Daubert, Joiner,* or *Kumho Tire* does the Supreme Court mandate the form that the inquiry into relevance and reliability must take.")

qualifications."[18] This may take the form of allowing defense to *voir dire* the expert at trial before he testifies or requiring the government to lay further foundation. The relevant inquiry is whether the district court made a finding that the foundation for the expert's testimony is "relevant and reliable."[19]

D. Argument.

    1. Summary.

Based on his training and expertise in field of pain medicine, Dr. Muir is well-qualified to present his analysis on lack of medical necessity and deviations from the standard of care with respect to the prescriptions charged in the Indictment. Because his analysis and opinions are based on his specialized training, experience, and knowledge – as opposed being based on a novel scientific method, theory, experiment, or test – it more than meets the threshold reliability determination under *Kumho Tire.* Defendant may disagree with Dr. Muir's choice of words and/or his analysis, but his disagreements, or those of his expert, are not test under *Daubert* – reliability is the test. Here, the reliability of Dr. Muir's opinions is grounded in his knowledge and expertise -- not in a novel experiment or theory – and therefore satisfies the predicate for admissibility under *Daubert*.

Lastly, Dr. Muir's opinion that the medical records show that defendant failed to perform a physical examination in connection with the charged prescriptions is fully admissible under Rule 702. The fact that his conclusion is based on the absence, rather than presence, of records does not mean that his conclusion is "not based on sufficient facts or data" under Rule

---

[18] *Alatorre,* 222 F.3d at 1103 (internal quotations and citations omitted).

[19] *Id.*

702(b). Dr. Muir relied on the applicable standard of care to reach his conclusion that the absence of differentiated records indicates that the event did not occur.

### 2. The Jury May Properly Consider Dr. Muir's Findings on Whether the Defendant Deviated from the Standard of Care When Prescribing Oxycodone or Hydrocodone.

The defendant is a physician charged with Section 841 violations for knowingly and intentionally distributing Schedule II substances without a legitimate medical purpose and outside the usual course of professional practice.[20] As part of its proof, the government may properly adduce evidence of the standard of care for prescribing Schedule II substances and show how the defendant deviated from that standard:

> We agree with [defendant's] observation that a violation of the standard of care alone is *insufficient* to support the criminal conviction of a licensed practitioner under § 841(a). But we do not agree that evidence of the governing standard of care is *irrelevant* or *prejudicial.* To the contrary, only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the "usual course of professional practice" that his actions become criminal.[21]

Defendant contends that Dr. Muir's opinions should be precluded because they originated from an inquiry into two complaints before the NSBME. According to defendant, the NSBME is not a law enforcement agency and does not conduct criminal investigations. Dr. Muir's report, so goes the argument, having originated with the NSBME cannot be used in a criminal trial because it fails to mention or conclude that defendant's actions violated the Controlled Substances Act.

---

[20] A physician's duty to prescribe controlled substances in the usual course of professional practice has been clear since at least 1975. See U.S. Moore, 423 U.S. 122 (1975).

[21] *United States v. Feingold,* 454 F.3d 1001, 1007 (9th Cir. 2006).

9

To the extent that defendant is claiming that the origin of Muir's opinions makes any difference under *Daubert*, the defendant is wrong. *Daubert* addresses whether the science or theory behind the opinion is "junky" based on certain factors; not whether the opinion originated with a criminal investigation. It makes no difference under *Daubert* where, when or how the opinion originated provided that it meets the threshold of being reliable. Defendant does not, and cannot, show that Dr. Muir's opinion is less reliable by virtue of having originated from an NSBME inquiry vice a criminal investigation. The Motion should be denied.

Defendant further contends that Dr. Muir's opinion is "unsuitable" in a criminal trial because "malpractice is not indicative of criminal wrongdoing" and does not include any element of "scienter or *mens rea*." [22] As stated above, the government must advance proof in its criminal case that defendant's prescriptions served no legitimate medical purpose and fell outside the normal course of professional practice. To do so, the government may properly offer circumstantial evidence of deviations from the standard of care:

> [E]vidence regarding the applicable standard of care is "not offered to establish malpractice, but rather to support the absence of any legitimate medical purpose in [the practitioner's] prescription of controlled substances." Knowing how doctors generally ought to act is essential for a jury to determine whether a practitioner has acted not as a doctor, or even as a *bad* doctor, but as a "pusher" whose conduct is without a legitimate medical justification. The district court therefore did not abuse its discretion in admitting evidence relating to the standard of care.[23]

Defendant's "malpractice" trope to the contrary, evidence of deviations from the standard of care is just as admissible in a criminal trial as it is in a civil malpractice case: the

---

[22] Motion at 5.

[23] *Feingold*, 454 F.3d at 1007 (citations omitted).

10

standard of care is what it is irrespective of venue. More to the point, however, defendant offers nothing to show anything contrary. Defendant must rely on more than the simple exhortation that "this should be a civil case" to preclude expert testimony – he must show that the opinion is unreliable. This he cannot do – the Motion should be denied.

Lastly, the defendant complains that Dr. Muir's opinion does not account for the defendant's state of mind. Dr. Muir will not be asked to opine – nor can he opine – about defendant's state of mind as that is a jury question and the ultimate issue in the case.[24] However, the fact that Dr. Muir's opinion does not include a *mens rea* element does not make his opinion irrelevant as the jury may consider the number and magnitude of the deviations from the standard of care as circumstantial evidence that the defendant acted knowingly and intentionally.

> **3.  Dr. Muir Properly Relied Upon the FSMB Model Policy As the Standard of Care for Physician's Prescribing Schedule II Substances in the State of Nevada.**

Defendant contends that Dr. Muir's opinions are inadmissible because his analysis was based, at least in part, on the FSMB Model Policy, claiming that the Model Policy expressly states that it "does not operate to create any specific standard of care" and Muir therefore cannot rely upon it. Defendant is wrong. There is nothing inappropriate about Dr. Muir's reliance on the FSMB Model Policy.

At the threshold, contrary to defendant's assertions, the Model Policy arguably is authoritative as to the standard of care in the State of Nevada because the NSBME has expressly adopted it as the standard of practice for prescribing opioids.[25] Thus, whether the

---

[24] *See* F. R. Evid. 704(b).

[25] Nevada Administrative Code, Section 630.187 ("The Board hereby adopts by reference: The Model Policy on the Use of Opioid Analgesics in the Treatment of Chronic Pain, July 2013, published by the Federation of State Medical Boards of the United States, Inc.") (2015).

language of the Model Policy portends to establish a standard of care, or not (as defendant contends), is beside the point. Here, Nevada's licensing authority has expressly adopted it as the governing practice standard. As such, it is directly relevant and reliable because it defines "the usual course of professional practice" in the state where the defendant prescribed the charged substances.

Moreover, Dr. Muir's analysis of deviations from the Model Policy was the product of a specific inquiry by the NSMBE, which asked him to evaluate defendant's practices in light of that policy. Dr. Muir did so, relying on his training and expertise to identify and evaluate the significant deviations. The fact that the authority that oversees defendant's license to practice medicine directed that Dr. Muir evaluate the defendant's conduct under the Model Policy is a strong indicator that Dr. Muir was using a reliable standard with respect to the practice of medicine in the State of Nevada.[26]

Lastly, defendant contends that Dr. Muir's references to the Model Policy make his opinion unreliable because he fails to acknowledge that the FSMB is not the "preeminent" authority on the standard of care. As noted above, whatever the FSMB's preeminence, the NSMBE governs the defendant's medical license; thus, making it authoritative as to standard of practice. Accordingly, the NSBME's reliance on the Model Policy establishes it as the standard of practice regardless of its nomenclature.

That said, it should be noted that the Model Policy simply states that by itself it does not serve as the standard of care which "must depend upon fact specific totality of circumstances

---

[26] Defendant claims that Dr. Muir's report "would not be accepted within the relevant discipline" (Mot. at 7) because, according to him, the FSMB "specifically states that it cannot be used [as a guideline]." Mot. at 7. Whatever the basis for that assertion, the government has found no language in the Model Policy that states that it "cannot be used" as a guideline or standard of practice by the NSBME, a physician, or an expert, when evaluating a physician's prescribing practices.

surrounding specific quality of care events." Or, put more simply, deviations from the standard of care depends on the facts and circumstances of each case.

Dr. Muir says nothing differently. He will render his opinion on deviations from the standard of care based on his examination of the records relative to each of the charged prescriptions, including the patient medical history, physical examination, and diagnostic tests revealed by those records. There is nothing earthshattering or controversial about the Model Policy's requirement that the prescribing physician keep accurate and complete patient records or that opioids should not be prescribed in excessively high doses. Defendant fails to state or show what it is about the Model Policy that makes it unworthy of reliance by Dr. Muir or what portions of the Model Policy are not followed within the community of pain medicine practitioners like Dr. Muir. He cannot. The Motion should be denied.

    **4.**    **Dr. Muir May Properly Opine About the Significance of Incomplete or Inaccurate Patient Medical Records.**

Dr. Muir will opine that his analysis of the medical records shows among other things, that the defendant's physical exam findings were "word for word" the same as between patients:

> It is my medical opinion that [defendant] failed to maintain proper medical records due to the fact that his records were inaccurate and incomplete. The medical records for all patients reviewed showed strikingly similar history, physical exam, assessment, and plan sections. In doing so, [defendant] failed to follow the [Model Policy] as this states [that] medical records must be accurate and complete. In fact, the physical exam finding for every patient are *word for word* exactly the same, which leads me to concluded that no physical exam was actually performed on his patients. Therefore, the medical records are inaccurate.

Defendant complains that Dr. Muir cannot render this opinion because it is not based on sufficient facts or data under Rule 702(b). Defendant is wrong.

13

1      The absence of unique and differentiated records is a datapoint from which Dr. Muir can draw conclusions because the standard of care requires accurate and complete medical records. Dr. Muir's conclusions are based on his expectation that records of physical examinations performed within the standard of care would reflect differences as between each patient because each patient presents a unique set of physical circumstances. The absence of differences – reports of exam being identical word for word -- therefore indicated to Dr. Muir that a physical examination was not conducted.

There is nothing inadmissible about this conclusion under Rule 702(b) because Dr. Muir based it on his review of the medical records and his understanding of the meaning of those records as a physician and expert practicing in the field of pain medicine. Without this conclusion – that no physical examination occurred – the jury is left without any understanding of the meaning and significance of the "word for word" similarity he found during his review of the records. An expert's testimony is supposed to assist the jury in understanding the evidence – not create confusion or leave unanswered questions.

Defendant complains that it is possible the defendant conducted a physical examination that was not documented in the records and, at all events, Dr. Muir was not present when the defendant interacted with the patient. While it is certainly possible that defendant's patient examination went undocumented, it is not likely if the defendant's practice comported with the Model Policy and the standard of care.

More to the point, however, the test for admissibility under Rule 702(b) is not whether it's possible something else occurred but whether Muir's conclusion as an expert is based on "sufficient facts or data." Here, his conclusion is based on available medical records and his understanding of the requirement for complete and accurate records under the standard of care.

Lastly, in this same vein, the jury will be instructed as to Dr. Muir's testimony as follows:

> Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.[27]

The defendant if free to make his "Dr. Muir wasn't there" and "the defendant kept bad records" arguments to the jury and urge that Dr. Muir's opinions be given no weight. But those arguments should not be used to deprive the jury of receiving and hearing the relevant information that it needs to reach an informed verdict.

**E.     Conclusion.**

**WHEREFORE**, for all the foregoing reasons, the government respectfully requests that the Court enter an Order denying defendant's Motion.

**DATED** this 7th day of March 2023.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

/s/ Steven W. Myhre
/s/ Nadia J. Ahmed

STEVEN W. MYHRE
NADIA J. AHMED
Assistant United States Attorneys
*Attorneys for the United States*

---

[27] Ninth Circuit Pattern Jury Instruction No. 3.14 (Opinion Evidence, Expert Witness) (2010).

**CERTIFICATE OF SERVICE**

I certify that this pleading has been served upon opposing counsel via CM/ECF at the time of filing.

Dated:  March 7, 2023

/s/ Steven W. Myhre
_____
STEVEN W. MYHRE
Assistant United States Attorney
District of Nevada